IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISRICT OF VIRGINIA
Richmond Division

MCKESSON MEDICAL-SURGICAL,
INC.,

    Plaintiff,

v.                      Civil Action No. 3:17cv631

FLOWER ORTHOPEDICS
CORPORATION,

    Defendant.

**MEMORANDUM OPINION**

This matter is before the Court on Defendant's MOTION TO
SET ASIDE ENTRY OF DEFAULT (ECF No. 15), as well as Plaintiff's
MOTION FOR ENTRY OF DEFAULT JUDGMENT (ECF No. 10) and FLOWER
ORTHOPEDICS CORPORATION'S MOTION FOR ENLARGEMENT OF TIME TO FILE
AN ANSWER AND COUNTERCLAIM (ECF No. 17). Defendant seeks to set
aside the Clerk of Court's Entry of Default (ECF No. 9) for good
cause, asserting that it failed to answer the Complaint because
the parties were engaged in ongoing settlement negotiations when
Plaintiff sought entry of default. For the reasons set forth
below, the MOTION TO SET ASIDE ENTRY OF DEFAULT (ECF No. 15)
will be granted; FLOWER ORTHOPEDICS CORPORATION'S MOTION FOR
ENLARGEMENT OF TIME TO FILE AN ANSWER AND COUNTERCLAIM (ECF No.
17) will be granted; and the MOTION FOR ENTRY OF DEFAULT
JUDGMENT (ECF No. 10) will be denied as moot.

## BACKGROUND

### 1.   Factual Background

McKesson   Medical-Surgical   Inc.   ("McKesson")   is   a distributor   of   medical   supplies,   medical   equipment,   surgical supplies,   and   medical   lab   supplies.   Flower   Orthopedics Corporation   ("Flower   Orthopedics")[1]   supplies   bone-fixation implants   and   surgical   instruments   that   are   used   primarily   for the   wrist,   hand,   shoulder,   foot,   and   ankle.   The   companies entered   into   a   distribution   agreement   ("the   Distribution Agreement")   on   March   8,   2013,   pursuant   to   which   McKesson   would be   a   non-exclusive   authorized   distributor   of   Flower   Orthopedics' products.   Compl. (ECF No. 1) ¶ 7; id., Ex. 1.

On or around September 1, 2013, the parties agreed to an amendment   to   the   Distribution   Agreement,   which,   in   relevant part,   provided   that:   (1)   McKesson   would   be   the   exclusive distributor   of   Flower   Orthopedics'   products   to   certain customers;   and   (2)   McKesson   would   purchase   certain   minimum amounts   of   Flower   Orthopedics'   products   for   several   six-month periods   beginning   in   August   2013.   Compl. ¶ 8;   id.,   Ex.   2. Nonetheless,   according   to   Flower   Orthopedics,   McKesson   failed   to meet   its   minimum   purchase   commitment   after   that   point,   and,

---

[1] The caption of this case incorrectly states Flower Orthopedics' name as "Flower Orthopedic."

indeed, sold a minimal amount of Flower Orthopedics' products during the course of the parties' relationship. Burckhardt Decl. (ECF No. 16-1) ¶¶ 6-7. As a result, Flower Orthopedics took steps to train McKesson's sales staff in selling Flower Orthopedics' products, and also hired a separate, independent distribution network that would implement a co-distribution strategy parallel to McKesson's sales efforts. Id. ¶¶ 8-9. Flower Orthopedics claims that it suffered financial harm from having to take these actions because of McKesson's poor distribution. Id. ¶ 10.

Then, on March 4, 2015, Flower Orthopedics terminated the exclusivity provision of the amended Distribution Agreement, effective 120 days from that date. Compl. ¶ 9. The parties subsequently reached a termination and repurchase agreement ("the Repurchase Agreement") on May 8, 2015, which required Flower Orthopedics to repurchase its products from McKesson in accordance with a particular schedule ("the Repurchase Schedule"). Id. ¶ 10; id., Ex. 3. When Flower Orthopedics was unable to pay consistent with the Repurchase Schedule, the parties modified it by agreement on February 1, 2016 ("the Repurchase Amendment"). Compl. ¶ 11; id., Ex. 4.

Flower Orthopedics failed to pay McKesson the full amount required by the modified Repurchase Schedule in the Repurchase

Amendment. Compl. ¶ 12. As of November 8, 2017, the amount of principal and late charges owed by Flower Orthopedics under the Repurchase Amendment was $2,287,176.00. Ringberg Aff. (ECF No. 10-1) ¶¶ 9-12.

In or around March 2017, Flower Orthopedics' CEO, Oliver Burckhardt ("Burckhardt"), discussed a possible resolution of the repayment schedule with Erik Ringberg ("Ringberg"), McKesson's Vice President for Supplier Management. The individuals exchanged proposals but could not reach any agreement. Ringberg later offered to settle if Flower Orthopedics would pay a larger amount than Burckhardt had proposed, but Flower Orthopedics did not agree to that offer. Burckhardt Decl. ¶ 15.

## 2.    Procedural Background

After those negotiations were unsuccessful, McKesson filed its Complaint here on September 19, 2017. ECF No. 1. It asserted three claims: FIRST CLAIM FOR RELIEF, Breach of Contract, related to Flower Orthopedics' failure to pay under the Repurchase Amendment; and SECOND CLAIM FOR RELIEF and THIRD CLAIM FOR RELIEF, Account Stated and Open Account, respectively, for the unpaid amount. Id. ¶¶ 6-22. McKesson then served a summons and a copy of the Complaint on Flower Orthopedics, through its vice president, on September 26, 2017. ECF No. 7.

On October 12 and 13, 2017, after Flower Orthopedics received the Complaint, its New Jersey counsel, G. Robert Marcus ("Marcus"), left two voicemails with McKesson's counsel, Jeffrey Garfinkle ("Garfinkle"). Garfinkle Decl. (ECF No. 20-1) ¶ 11. When Garfinkle returned those calls on October 13, Marcus explained why Flower Orthopedics did not accept Ringberg's last settlement offer, and then made a counter-proposal. Marcus Decl. (ECF No. 16-2) ¶ 3. Garfinkle indicated that any settlement offer would need to be in writing, Garfinkle Decl. ¶ 12, so Marcus sent Garfinkle an e-mail later that day confirming the details of the earlier offer, Marcus Decl. ¶ 3. None of Marcus's communications referenced the Complaint or this litigation, although both attorneys expressed a general desire to avoid litigation in their conversation. Garfinkle Decl. ¶¶ 12-13; Marcus Reply Decl. (ECF No. 21-1) ¶ 3.

McKesson apparently found the October 13 offer unacceptable, and Garfinkle never responded to Marcus. Garfinkle Decl. ¶ 14. Having not received any response, Marcus claims that he called Garfinkle and left a voicemail on October 20, 2017. Marcus Decl. ¶ 4; Marcus Reply Decl. ¶ 6. Garfinkle asserts that he never received that message. Garfinkle Decl. ¶¶ 15-16.

In any event, Flower Orthopedics did not file an answer or otherwise respond to the Complaint within the required twenty-

one days. See Fed. R. Civ. P. 12(a)(1)(A)(i). As a result, on October 25, 2017, McKesson requested that the Clerk of Court enter default against Flower Orthopedics. ECF No. 8. The Clerk then entered default on November 6, 2017. ECF No. 9.

Marcus had left another voicemail with Garfinkle on November 3, but Garfinkle was unable to respond until November 6. When he called Marcus on that date, Garfinkle informed him that McKesson had rejected the October 13 settlement offer, and that the Clerk had entered default against Flower Orthopedics. Marcus Decl. ¶ 4; Garfinkle Decl. ¶ 17. Garfinkle also rejected Marcus's request to have the entry of default set aside. Marcus Decl. ¶ 6.

Shortly thereafter, on November 8, 2017, McKesson moved to have the Court enter default judgment against Flower Orthopedics. ECF No. 10. Flower Orthopedics did not file an opposition to that motion, but instead moved on November 13 to have the Clerk's entry of default set aside.[2] ECF No. 15. Flower Orthopedics also moved to enlarge the time to file an answer, attaching a proposed Answer and Counterclaim. ECF No. 17; id.,

---

[2] Thus, this motion effectively serves as an opposition to McKesson's motion for default judgment, which would have been analyzed under the same standard as a motion to set aside entry of default. See Vick v. Wong, 263 F.R.D. 325, 329 (E.D. Va. 2009).

Ex. A. McKesson has only responded to Flower Orthopedics' motion to set aside the entry of default. See ECF No. 20.

DISCUSSION

## 1. Legal Standard

Entry of default is mandatory where, as here, a party "has failed to plead or otherwise defend, and that failure is shown by affidavit." Fed. R. Civ. P. 55(a). However, "[t]he court may set aside an entry of default for good cause." Id. 55(c). Courts analyze six factors when deciding whether good cause exists: "whether the moving party has a meritorious defense, whether it acts with reasonable promptness, the personal responsibility of the defaulting party, the prejudice to the party, whether there is a history of dilatory action, and the availability of sanctions less drastic." Payne ex rel. Estate of Calzada v. Brake, 439 F.3d 198, 204-05 (4th Cir. 2006); see also Consol. Masonry & Fireproofing, Inc. v. Wagman Constr. Corp., 383 F.2d 249, 251 (4th Cir. 1967) ("Generally a default should be set aside where the moving party acts with reasonable promptness and alleges a meritorious defense.").

Deciding whether a defaulting party has shown good cause "is a matter which lies largely within the [Court's] discretion." Payne, 439 F.3d at 204. The Fourth Circuit, however, has "repeatedly expressed a strong preference that, as

7

a general matter, defaults be avoided and that claims and defenses be disposed of on their merits." Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc., 616 F.3d 413, 417 (4th Cir. 2010); see also Tazco, Inc. v. Dir., Office of Workers Comp. Program, U.S. Dep't of Labor, 895 F.2d 949, 950 (4th Cir. 1990) ("The law disfavors default judgments as a general matter . . . ."); Lolatchy v. Arthur Murray, Inc., 816 F.2d 951, 954 (4th Cir. 1987) ("[A]n extensive line of decisions has held that [Rule] 55(c) must be liberally construed in order to provide relief from the onerous consequences of defaults . . . ." (internal quotations omitted)). Moreover, the burden on a defendant seeking relief from entry of default under Rule 55(c) is lower than the burden for relief from default judgments under Rule 60(b). Although analyses under both provisions implicate similar factors, "Rule 55(c)'s 'good cause' standard . . . is more forgiving of defaulting parties because it does not implicate any interest in finality," as no judgment has been entered. Colleton Preparatory Acad., 616 F.3d at 420.

2. **Motion to Set Aside Entry of Default**

The parties' arguments focus almost exclusively on the reasons for Flower Orthopedics' failure to answer, which bear on its personal responsibility, and the availability of a meritorious defense. They largely ignore the remaining four

8

<u>Payne</u> factors.[3] However, the factual record before the Court is developed enough for it to examine all the factors here. Doing so leads to the conclusion that the entry of default against Flower Orthopedics should be set aside.

## A. Meritorious Defense

To show the existence of a meritorious defense only "requires a proffer of evidence which would permit a finding for the defaulting party or which would establish a valid counterclaim." <u>Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.</u>, 843 F.2d 808, 812 (4th Cir. 1988). This standard is "not onerous," <u>Pinpoint IT Servs., L.L.C. v. Atlas IT Exp. Corp.</u>, 812 F. Supp. 2d 710, 724 (E.D. Va. 2011); indeed, "all that is necessary . . . is a presentation or proffer of evidence, which, if believed, would permit either the Court or the jury to find for the defaulting party," <u>United States v. Moradi</u>, 673 F.2d 725, 727 (4th Cir. 1982); <u>see also</u> <u>Augusta Fiberglass</u>, 843 F.2d at 812 ("The underlying concern is . . . whether there is <u>some possibility</u> that the outcome . . . after a full trial will be contrary to the result

---

[3] McKesson contends that Flower Orthopedics' failure to address these factors implies that they are either irrelevant or weigh in McKesson's favor. That argument has effectively been mooted by Flower Orthopedics' discussion of each factor in its reply. Moreover, McKesson also failed to address those factors, so it is unclear why they would automatically weigh in its favor even in the absence of argument.

achieved by the default." (alterations in original) (emphasis added) (internal quotations omitted)). Nonetheless, "the defenses must 'allege [ ] specific facts beyond simple denials or conclusionary statements.'" Pinpoint IT Servs., 812 F. Supp. 2d at 724 (quoting United States v. $55,518.05 in U.S. Currency, 728 F.2d 192, 195 (3d Cir. 1984)). As with the other good cause factors, the Court has the discretion to decide whether a proffered defense or counterclaim is meritorious, id., but disputed factual questions should be resolved in the defaulting party's favor, see Augusta Fiberglass, 843 F.2d at 812; Vick, 263 F.R.D. at 330.

Flower Orthopedics contends that it has a viable affirmative defense of prior material breach. In Flower Orthopedics' view, McKesson breached the Distribution Agreement and the amendment thereto when it failed to distribute Flower Orthopedics' products effectively and did not fulfill its minimum purchase commitments. Consequently, says Flower Orthopedics, McKesson cannot bring any claims against Flower Orthopedics based on that contract. See Countryside Orthopaedics, P.C. v. Peyton, 261 Va. 142, 154 (2001) (explaining prior material breach doctrine); see also Bayer Cropscience LP v. Albemarle Corp., 696 F. App'x 617, 622 (4th Cir. 2017) (same). Because McKesson's Second and Third Claims

10

are derivative of its First Claim for breach of contract, this defense would, if meritorious, apply to all three of McKesson's claims.

In response, McKesson argues that the prior material breach doctrine cannot supply a meritorious defense here for two reasons. First, it says, that doctrine does not apply because the Repurchase Agreement was a novation of the Distribution Agreement, and thus extinguished any obligations the parties had under the Distribution Agreement. As such, McKesson's alleged breach of the Distribution Agreement is irrelevant to the validity of its claims under the Repurchase Agreement (and, by extension, the Repurchase Amendment). Second, McKesson asserts that, even if the Repurchase Agreement was not a novation, Flower Orthopedics waived the right to assert a prior material breach defense when it continued to perform under the Distribution Agreement even after McKesson allegedly breached that contract.

Neither of McKesson's assertions are compelling here. With respect to its first argument, a novation is

> a mutual agreement . . . for discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the debtor . . . . To effect a novation there must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement . . . . Its essential requisites are a previous

> valid obligation, the agreement of all
> parties to the new contract, the
> extinguishment of the old contract, and the
> validity of the new contract.

Honeywell, Inc. v. Elliott, 213 Va. 86, 89-90 (1972). The party

asserting a novation bears the burden of showing all these

elements with "clear and satisfactory" proof. Id.; see also Dere

v. Montgomery Ward & Co., 224 Va. 277, 281 (1982). In addition,

whether the parties intended to create a novation "'is to be

determined from all the facts and circumstances incident to the

new agreement.'" Norfolk S. Ry. Co. v. Drummond Coal Sales,

Inc., No. 7:08cv00340, 2016 WL 4532411, at *6 (W.D. Va. Aug. 29,

2016) (quoting Dillenberg v. Thott, 217 Va. 433, 435 (1976)).

Here, the parties agree that the Distribution Agreement was

followed by the Repurchase Agreement and involved the same

parties, but they dispute the underlying intent and effect of

the latter agreement. McKesson contends that Section 8 of the

Repurchase Agreement clearly shows the parties' intent to

extinguish the Distribution Agreement. That provision states, in

relevant part, that: "The Distribution Agreement, including

without limitation any provisions therein relating to the return

of inventory, is hereby terminated by mutual consent, including

without limitation, Section 7 (Exclusivity) of the Distribution

Agreement. Provisions in the Distribution Agreement which by

their terms survive termination are incorporated by reference

herein . . . ." Flower Orthopedics, however, asserts that the parties did not intend to release claims arising under the Distribution Agreement by executing either the Repurchase Agreement or the Repurchase Amendment. In fact, as Flower Orthopedics explains, although McKesson initially sought to have Flower Orthopedics release such claims in the Repurchase Agreement, McKesson removed a release provision from that agreement when Flower Orthopedics refused to agree to it. Burckhardt Decl. ¶ 14; Marcus Reply Decl., Ex. A.

It may turn out to be true that the Repurchase Agreement is a novation, after the parties have had a chance to conduct full discovery. But resolving that issue here would be premature. The facts provided in the Burckhardt Declaration establish that McKesson may have breached the Distribution Agreement, and that such breach could still be alleged under the Repurchase Agreement and Repurchase Amendment, as the parties did not intend to fully release obligations arising under the Distribution Agreement. Burckhardt Decl. ¶¶ 6-14. This breach might reduce or eliminate Flower Orthopedics' liability to McKesson under those latter agreements. Based on these facts, it cannot be said that Flower Orthopedics has "presented no statement of underlying facts . . . to enable the court to appraise the merits of the claimed defense." Consol. Masonry &

Fireproofing, 383 F.2d at 252; see also Red Light Mgmt., Inc. v. Dalton, 315 F.R.D. 65, 70-72 (W.D. Va. 2016) (defaulting party failed to establish meritorious defense where he "rel[ied] on a purely legal argument" without any supporting facts, and claimed defenses were inconsistent with available evidence). Rather, construing these facts in Flower Orthopedics' favor, they are a sufficient proffer of a meritorious defense.

McKesson's argument about Flower Orthopedics' continued performance fails for the same reason. As interpreted recently by the Fourth Circuit, the prior material breach doctrine does not bar a breaching plaintiff "from suing [defendant] for [defendant]'s subsequent breaches of contract when both parties continued to perform under the contract." Bayer Cropscience, 696 F. App'x at 623. This argument thus presents the question of whether Flower Orthopedics has waived the right to challenge McKesson's breach by continuing to perform under the Distribution Agreement. And waiver is generally a factual issue that depends on a party's conduct, acts, or course of dealing. See Bernsen v. Innovative Legal Mktg., LLC, 885 F. Supp. 2d 830, 833-34 (E.D. Va. 2012). Considering the facts proffered in the Burckhardt Declaration, it is impossible to conclude with any certainty that Flower Orthopedics' continued performance post-breach effected a waiver of its right to assert a breach of

contract claim against McKesson. Accordingly, Flower Orthopedics has presented enough evidence to show that its claimed defense is not "without any merit," Pinpoint IT Servs., 812 F. Supp. 2d at 725, so this factor weighs in its favor here.

### B. Reasonable Promptness

The reasonable promptness factor similarly weighs in favor of setting aside the entry of default. "Whether a party has taken 'reasonably prompt' action . . . must be gauged in light of the facts and circumstances of each [case]." Moradi, 673 F.2d at 727. Nonetheless, "courts routinely look at other courts' decisions to determine whether a delay is reasonable." Burton v. The TJX Cos., Inc., No. 3:07-CV-760, 2008 WL 1944033, at *3 (E.D. Va. May 1, 2008).

There is little dispute that Flower Orthopedics acted promptly here. The Clerk entered default against Flower Orthopedics on November 6, 2017, and Flower Orthopedics moved to set that default aside—and also filed its proposed answer—only seven days later. The Fourth Circuit has concluded that moving to set aside entry of default within nine days is reasonably prompt. See Colleton Preparatory Acad., 616 F.3d at 418; see also Tazco, 895 F.2d at 950 (party acted promptly where it filed answer "[w]ithin eight days of receiving notification of the default award"). Courts have also found reasonable promptness

where defaulting parties waited much longer before seeking relief. See JTH Tax, Inc. v. Callahan, No. 2:12CV691, 2013 WL 3035279, at *9 (E.D. Va. June 6, 2013) (defendant acted with reasonable promptness in moving to set aside default sixteen days after default was entered); Burton, 2008 WL 1944033, at *3 ("District courts in the Fourth Circuit have found that a defendant acted reasonably promptly when waiting seventeen, twenty-one, and thirty-two days after default was entered before attempting to set it aside." (citing United States v. $10,000.000 in United States Currency, No. 1:00-CV-0023, 2002 WL 1009734, at *3 (M.D.N.C. Jan. 29, 2002); Esteppe v. Patapsco & Back Rivers R.R. Co., No. Civ. H-00-3040, 2001 WL 604186, at *4 (D. Md. May 31, 2001); Wainwright's Vacations, LLC v. Pan Am. Airways Corp., 130 F. Supp. 2d 712, 718 (D. Md. 2001))). Therefore, this factor weighs in Flower Orthopedics' favor here.

## C. Personal Responsibility

This factor is neutral at worst, and at best, weighs in favor of setting default aside. Courts may decline to set aside an entry of default "when the party's default was intentional or the result of negligence." Pinpoint IT Servs., 812 F. Supp. 2d at 726. At the same time, "when . . . default was the result of negligence, the Court may consider whether the negligence was excusable" in weighing this factor. Id. The pertinent issue is

whether the defaulting party is "ultimately responsible" for the failure to respond. Id. Deciding that question requires courts to "focus on the source of the default" and "distinguish between the fault of [the defaulting party]'s attorney and the fault, if any, of [the defaulting party] itself." Augusta Fiberglass, 843 F.2d at 811. "[J]ustice," after all, "demands that a blameless party not be disadvantaged by the errors or neglect of his attorney which cause a final, involuntary termination of proceedings." Moradi, 673 F.2d at 728.

In recognition of these principles, courts in the Fourth Circuit have consistently found that defaulting defendants were not personally responsible for defaults that were attributable to their attorneys or agents. See Colleton Preparatory Acad., 616 F.3d at 419-20 (defendant's agent received summons and complaint but forwarded to third party instead of defendant); Augusta Fiberglass, 843 F.2d at 811-12 (defendant's attorney was served with amended complaint but never sent it to defendant); Lolatchy, 816 F.2d at 952-53 (default followed repeated failure of defendants' attorney to respond to plaintiff's discovery requests); Moradi, 673 F.2d at 727-28 (default occurred because, after defendant retained counsel, attorney failed to obtain local counsel to submit pleadings). In contrast, defendants have been considered personally responsible where they took minimal

steps to obtain counsel or communicate with counsel after receiving the complaint. See Red Light Mgmt., 315 F.R.D. at 72-73 (although defendant hired counsel to negotiate settlement with plaintiff, defendant did not contact attorney when served with process); Pinpoint IT Servs., 812 F. Supp. 2d at 726-27 (defendant only sent single e-mail to try and obtain local counsel despite knowing for weeks that plaintiff would initiate suit).

Flower Orthopedics' contention that any neglect leading to its default was attributable to its attorney is persuasive. Burckhardt and Ringberg had engaged in settlement negotiations well before McKesson filed its Complaint. Then, after Flower Orthopedics was served with a copy of the summons and the Complaint, its attorney, Marcus, reached out to McKesson's counsel, Garfinkle, seemingly to continue the parties' previous settlement negotiations. Marcus and Garfinkle spoke on October 13, 2017, only four days before Flower Orthopedics had to file its answer pursuant to Rule 12. After the attorneys did not reach any resolution, for whatever reason, Marcus did not attempt to contact Garfinkle again until, at the earliest, October 20,[4] after the answer deadline had passed. Garfinkle did

---

[4] Marcus and Garfinkle dispute whether Marcus ever called Garfinkle on this date, but that disagreement is immaterial to

not respond until November 6, when default was entered, and Flower Orthopedics filed this motion shortly thereafter.

Given this background, it appears that, after Flower Orthopedics received the Complaint, Marcus contacted Garfinkle to determine if McKesson would be willing to resolve the parties' contract dispute without litigation. Marcus likely took these steps at the direction of Flower Orthopedics, particularly because he was also—as stated to Garfinkle—a member of the company's board of directors. Garfinkle Decl. ¶ 12. As a result, it is also reasonable to infer that Marcus was responsible for notifying Flower Orthopedics of the progress, or lack thereof, of the settlement negotiations, and the need to respond to the Complaint by a certain date. See Burton, 2008 WL 1944033, at *4 (inferring that, "since [defendant]'s attorney was hired to answer [the] complaint, she was responsible for the answer's lateness"). Thus, Flower Orthopedics' failure to answer was most likely caused by Marcus's failure to timely apprise Flower Orthopedics of the lack of success in the settlement negotiations. It is true that, unlike in some of the cases in which the defendants were not personally responsible, Flower Orthopedics actually received the Complaint, which suggests that it bears more responsibility than those defendants. However, the

---

whether Flower Orthopedics or Marcus was responsible for the failure to file a timely answer.

circumstances here do not indicate that Flower Orthopedics was primarily responsible because it did not simply sit on its hands after receiving the Complaint, as in Red Light Management or Pinpoint IT Services. See Red Light Mgmt, 315 F.R.D. at 72-73; Pinpoint IT Servs., 812 F. Supp. 2d at 726-27. To the contrary, Flower Orthopedics enlisted Marcus to take certain actions, and Marcus did not update the company as he should have when those actions failed to produce the desired result. See Burton, 2008 WL 1944033, at *4. Consequently, even if Flower Orthopedics is not blameless, it is not the party responsible for the missed deadline. This factor therefore weighs in favor of setting aside default.

Furthermore, there is no question that relying on settlement negotiations as a basis for not responding to the Complaint does not excuse Flower Orthopedics' failure to respond to the Complaint. But McKesson's citation of numerous cases establishing that proposition misses the point. McKesson makes no attempt to separate Flower Orthopedics' culpability from Marcus's, as the Fourth Circuit has done, and that distinction is critical here. Moreover, even if Flower Orthopedics could be considered personally responsible, courts should not "place[] overarching emphasis on a single Payne factor," especially where a defaulting party seeks relief from an entry of default instead

20

of a default judgment. <u>Colleton Preparatory Acad.</u>, 616 F.3d at 419-21. Therefore, even if this factor weighs against Flower Orthopedics, it is not dispositive in the good cause analysis.

### D. History of Dilatory Action

McKesson has not shown any evidence that Flower Orthopedics has a history of dilatory action. In these circumstances, where a defaulting party has not engaged in delays preceding the entry of default, courts consider whether the party has acted timely during the pending litigation. <u>See</u> <u>Red Light Mgmt.</u>, 315 F.R.D. at 73 (factor weighed in defendant's favor where he had "no previous history of dilatory action" and his "filings ha[d] been timely since he entered this action"); <u>Pinpoint IT Servs.</u>, 812 F. Supp. 2d at 727 (despite lack of previous history of delay, factor weighed against defaulting party because it "had more than one instance of dilatory action in this matter"). Here, Flower Orthopedics' only other filing since appearing in this action—its reply in support of the motion to set aside the entry of default—was timely. Consequently, this factor weighs in favor of setting aside the entry of default.

### E. Prejudice to the Plaintiff

This factor also weighs in Flower Orthopedics' favor. To assess the prejudice to the non-defaulting party, courts examine whether the delay: (1) made it impossible for the non-defaulting

party to present some of its evidence; (2) made it more difficult for the non-defaulting party to proceed with trial; (3) hampered the non-defaulting party's ability to complete discovery; and (4) was used by the defaulting party to collude or commit a fraud. See Lolatchy, 816 F.2d at 952-53. Courts give the most weight to the first two factors. Burton, 2008 WL 1944033, at *4 (citing Lolatchy, 816 F.2d at 952-53). In addition, mere inconvenience or "delay in and of itself does not constitute prejudice." Colleton Preparatory Acad., 616 F.3d at 418; see also Lolatchy, 816 F.2d at 953.

McKesson has not demonstrated that it would be prejudiced by letting this case proceed on the merits. There are no facts suggesting that Flower Orthopedics' late response has affected McKesson's ability to present evidence, proceed with trial, or complete discovery. Indeed, this action is at such an early stage, and Flower Orthopedics rectified its error so quickly, that the scheduling impact of the delay has likely been minimal. Accordingly, this factor weighs in favor of setting aside default.

## F.   Availability of Lesser Sanctions

Neither party has identified any lesser sanctions that are appropriate here besides default, but such lesser sanctions undoubtedly exist. For instance, courts have "commonly imposed

22

alternative monetary sanctions on attorneys who are responsible for a party's default." Vick, 263 F.R.D. at 331 (citing, inter alia, GNB, Inc. v. Tropex, Inc., 849 F.2d 605, 1988 WL 60618, at *2 (4th Cir. June 3, 1988) (alternative sanction of attorney's fees appropriate); Lolatchy, 816 F.2d at 953-54 (sanctions short of default such as costs, attorneys' fees, or contempt of court would have likely cured attorney's failure to respond); Smith v. Bounds, 813 F.2d 1299, 1304 (4th Cir. 1987) (contempt sanctions appropriate as an alternative to default judgment)). Here, as discussed, the delay appears to be largely attributable to Marcus's failure to ensure that Flower Orthopedics responded to the Complaint while he was engaged in settlement negotiations with Garfinkle. Thus, monetary sanctions on Marcus is a possible alternative to the drastic sanction of entry of default. And, even if Flower Orthopedics was more responsible than Marcus for the delay, the Court could simply require Flower Orthopedics to pay McKesson's fees and costs associated with seeking entry of default and default judgment. See Red Light Mgmt., 315 F.R.D. at 73; Pinpoint IT Servs., 812 F. Supp. 2d at 728. Therefore, given the availability of sanctions other than entry of default or default judgment, this factor weighs in Flower Orthopedics' favor.

## 3. Motion for Enlargement of Time to Answer

The decision to grant Flower Orthopedics' motion to set aside the entry of default necessitates consideration of Flower Orthopedics' request to file an untimely answer. That request is governed by Rule 6(b):

> When an act may or must be done within a specified time, the court may, for good cause, extend the time:
>
> > (A) with or without motion or notice . . . if a request is made, before the original time or its extension expires; or
> >
> > (B) on motion made after the time has expired if the party failed to act because of excusable neglect.

Fed. R. Civ. P. 6(b)(1). Flower Orthopedics was required to respond to the Complaint within twenty-one days of service—that is, by October 17, 2017. See id. 12(a)(1)(A)(i). However, it did not move to extend the time to answer until November 13, 2017, well after that deadline had passed. Therefore, the Court may only grant Flower Orthopedics' motion if it failed to answer because of "excusable neglect," and if there is "good cause" to allow an extension.

Deciding whether a party's neglect is excusable is "at bottom an equitable [inquiry], taking account of all relevant

circumstances surrounding the party's omission."[5] *Pioneer Inv.*
*Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395
(1993). Relevant factors include "the danger of prejudice to the
[non-movant], the length of the delay and its potential impact
on judicial proceedings, the reason for the delay, including
whether it was within the reasonable control of the movant, and
whether the movant acted in good faith." *Id.* Furthermore,
"[a]lthough inadvertence, ignorance of the rules, or mistakes
construing the rules do not usually constitute 'excusable'
neglect, it is clear that 'excusable neglect' under Rule 6(b) is
a somewhat elastic concept." *Id.* at 392 (internal quotations
omitted). Nonetheless, excusable neglect "is not easily
demonstrated" under this standard. *Thompson v. E.I. DuPont de*
*Nemours & Co.*, 76 F.3d 530, 534 (4th Cir. 1996).

Flower Orthopedics has shown that its neglect in failing to
timely respond to the Complaint is excusable. As explained
above, the delay here was insignificant and has not prejudiced
McKesson in any meaningful way. In addition, Flower Orthopedics
appears to have acted in good faith, believing that McKesson
would not seek entry of default because of ongoing settlement

---

[5] Although *Pioneer* interpreted the meaning of "excusable neglect"
in the context of the Federal Rules of Bankruptcy Procedure,
courts have applied its framework in discussing excusable
neglect under Rule 6(b). *See, e.g.*, *Tucker v. Chrysler Credit*
*Corp.*, 149 F.3d 1170, 1998 WL 276266, at *2-3 (4th Cir. May 29,
1998).

negotiations and then filing a proposed answer shortly after learning of the default. Finally, the reason for Flower Orthopedics' delay—the "most important of the [Pioneer] factors," id.—indicates that its failure to answer the Complaint was an inadvertent mistake. Flower Orthopedics must be held accountable in this context for the acts and omissions of its attorney, Marcus. Pioneer Inv. Servs., 507 U.S. at 396-97. But, when a defaulting party is not primarily responsible for the default, its attorney's negligence can still be excusable neglect. See Augusta Fiberglass, 843 F.2d at 811. Here, as noted, Flower Orthopedics' default was caused primarily by Marcus's failure to have Flower Orthopedics respond to the Complaint during the ongoing (in Flower Orthopedics' view) settlement negotiations. This error resulted from the reasonable, albeit mistaken, assumption that Garfinkle would reject Flower Orthopedics' latest settlement offer before McKesson sought entry of default. Taking these facts into account, and considering the factors outlined in Pioneer, Marcus's neglect, and thereby Flower Orthopedics', is excusable.

In addition, there is good cause for extending Flower Orthopedics' time to answer the Complaint. This opinion has already explained at length why there is good cause for setting aside the entry of default against Flower Orthopedics. See supra

Section II. And, as described above, Flower Orthopedics has established that its neglect in responding to the Complaint was excusable. Consequently, extending its time to answer the Complaint under Rule 6(b)(1) is appropriate here.

## CONCLUSION

For the foregoing reasons, Defendant's MOTION TO SET ASIDE ENTRY OF DEFAULT (ECF No. 15) will be granted; FLOWER ORTHOPEDICS CORPORATION'S MOTION FOR ENLARGEMENT OF TIME TO FILE AN ANSWER AND COUNTERCLAIM (ECF No. 17) will be granted; and Plaintiff's MOTION FOR ENTRY OF DEFAULT JUDGMENT (ECF No. 10) will be denied as moot.

It is so ORDERED.

/s/    *l ε/*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February 15, 2018